IN THE SUPREME COURT OF TENNESSEE

AT KNOXVILLE

FILED

April 22, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

GENE V. AABY,    )    FOR PUBLICATION:
                 )
    Plaintiff-Appellee,    )    Filed: April 22, 1996
                 )
v.               )    KNOX CHANCERY
                 )
JUDY E. AABY STRANGE    )    Hon. Frederick D. McDonald,
                 )    Chancellor
    Defendant-Appellant.    )
                 )
                 )
                 )
                 )    No. 03S01-9507-CH-00073


For Plaintiff-Appellee:              For Defendant-Appellant:

George F. Legg                       Sarah Y. Sheppeard
Becky H. Halsey                      William A. Mynatt
Stone & Hinds, P.C.                  Sheppeard & Swanson, P.C.
Knoxville, Tennessee                 Knoxville, Tennessee



O P I N I O N



COURT OF APPEALS REVERSED.                          DROWOTA, J.

In this child custody dispute, Judy E. Strange, the custodial parent, appeals from the Court of Appeals' affirmance of the trial court's order denying her permission to move out-of-state with her child. The sole issue for our determination is whether the lower courts properly interpreted the principles enunciated in <u>Taylor v. Taylor</u>, 849 S.W.2d 319 (Tenn. 1993) in deciding this case. For the reasons set forth below, we conclude that the lower courts did not do so; therefore, we reverse the judgment.

## FACTS AND PROCEDURAL HISTORY

Judy E. Strange and Gene V. Aaby were divorced on June 6, 1990, by final judgment entered in the Knox County Chancery Court. This judgment incorporated a marital dissolution agreement, which, among other things, awarded custody of the parties' then-three year old son, Brandon, to the mother. The order granted the father visitation on alternate weekends; it also provided for certain summer and vacation visitation. The judgment contained no prohibition against the custodial parent moving out-of-state with Brandon.

This dispute began in June 1992 when the father filed a petition requesting that his child support obligation be decreased. The mother, in response, filed a petition opposing the decrease. Her petition also included a "counterclaim," in which the mother requested permission to move with Brandon to Bardstown, Kentucky. The mother's stated reason for wishing to move was that she had remarried, and that her new husband, Kendall Strange, had family in the Bardstown area. She also stated that she had received a suitable offer of employment in Bardstown. The father answered the counterclaim by asserting that a move to Kentucky would not be in the

2

best interests of the child; the father sought to have custody changed to him if the mother took Brandon to Kentucky.

At the initial hearing in January 1993 on the custody issues, the mother testified that she wished to move to Bardstown because of the reasons stated in her petition.  The father, on the other hand, offered expert psychological and psychiatric proof which tended to show that removal would not be in Brandon's best interests. The experts based these conclusions, in part, on the relationships Brandon had formed with his father and the father's extended family.  At the conclusion of the proof, the trial court ruled that the mother had failed to prove that she should be allowed to move to Kentucky with the child.

In March 1993 the mother then filed a motion to alter or amend the judgment, arguing that the ruling violated the principles set forth in Taylor, supra, which had just been released by this Court.  The trial court agreed to reopen the proof, and after hearing additional evidence and considering the case in light of Taylor, ruled that the mother would be allowed to move to Kentucky.  The November 1993 memorandum opinion issued by the trial court provides, in part, that:

> The mother's fundamental reason for wanting to move from Knoxville to Bardstown is her desire to locate in a smaller community, which she believes will provide a better place in which to live.  The testimony is convincing that the mother herself will feel much better living in a smaller community than Knoxville.  She grew up in a smaller community.  She believes a smaller community will be a better place to raise Brandon.  It cannot be found that her desire to move is wrong, notwithstanding testimony that it will have some disruptive effect on the boy.  Indeed, under Taylor the effect on the child is generally to be given lesser consideration.  In any event there is testimony that Brandon will be able to adjust to the move.

3

In the absence of convincing evidence that the child will be harmed the Court should be very hesitant to substitute its opinion for the mother's decision, which is one of the many a custodial parent must make that will affect a child. Bardstown has a good school system, and her present husband has relatives there. While the move is not made in order for either the mother or her present husband to improve their employment opportunities, it appears that they will have reasonable opportunities for employment there ... The mother has expressed a valid reason for moving, although her reason may well be viewed by others as insufficient. It also appears that in a moment of anger the mother spoke [to Brandon's teacher] of taking Brandon to Kentucky without allowing the father to see Brandon again. It is not concluded, however, that the mother's motivation for the move is to deny or deter the father's visitation. It is accordingly concluded from the evidence and in light of Taylor ... that the mother should be, and accordingly is, granted permission to take Brandon to Bardstown.

The trial court also ordered a revised visitation schedule, in which the father was granted additional summer and vacation visitation. Finally, the trial court denied the father's petition for a change of custody based on the proposed move.

In December 1993 the father filed a motion to alter or amend, arguing that the November 1993 judgment conflicted with an unpublished opinion of the Eastern Section of the Court of Appeals that had just been released. After reviewing its decision in light of this opinion, the trial court reverted to its original determination, holding that the mother had not proven that the move would be in Brandon's best interest. The mother resigned from her new job in Kentucky and moved back to Knoxville after learning of the ruling.

The mother appealed from this decision to the Court of Appeals, which affirmed the decision. After the Court of Appeals' decision was handed down, the mother and Kendall Strange separated; and she has since filed for divorce. Because

4

the trial court's vacillating course of action in this case obviously indicates the presence of confusion in the law of removal, we granted the mother's application for permission to appeal for the purpose of clarifying this law.

## BACKGROUND OF THE LAW OF REMOVAL

### A. Pre-Taylor law

In the not too distant past, Tennessee law conferred upon the custodial parent sole responsibility for making decisions regarding the place of the child's residence. For example, in Thomas v. Thomas, 206 Tenn. 584, 335 S.W.2d 827 (1960), the non-custodial parent, the father, requested that he be relieved of his duty to provide child support because the mother had deprived him of his visitation rights by remarrying and moving to Texas with the children. We rejected that argument, holding that "the mother had the right to control the child's whereabouts and the father had no voice where the child should reside and could not make his duty to support the child depend upon the place of the child's abode." Thomas, 335 S.W.2d at 828. We further stated that "the mere fact that the decree grants the other parent the right of visitation does not implicitly prohibit the removal of the child from the jurisdiction." Id. See also Evans v. Evans, 125 Tenn. 112, 140 S.W.745, 746 (1911) ("The custody of this child was entrusted to her mother. [The father] has no voice as to where she shall reside; but, by decree of the court, the mother is made the arbiter of such matters.")

Subsequently, however, Tennessee courts began moving away from the

5

position that the non-custodial parent had no say whatsoever in the removal decision. Instead, the Court of Appeals twice held that if the non-custodial parent wished to prevent the move, he or she would be required to prove that removal would not be in the "best interests of the child." See Arnold v. Gouvista, 735 S.W.2d 458, 463 (Tenn. App. 1987) (custodial parent may not be held in contempt of court for leaving the state with child if divorce decree contains no provision prohibiting movement; burden rests upon non-custodial parent to prove that move is not in the best interests of the child); Walker v. Walker, 656 S.W.2d 11 (Tenn. Ct. App. 1983) (where divorce decree prohibits custodial parent from removing the child from state, that parent bears burden of proving that move is in best interests of the child; however, where divorce decree contains no such provision, burden is on noncustodial parent seeking to prevent the move).

These rules granting the custodial parent substantial autonomy of movement were, however, undermined in 1988 by this Court in Seessel v. Seessel, 748 S.W.2d 422 (Tenn. 1988). In that case, the custodial parent filed a petition to remove the child to Colorado; and the non-custodial parent filed a counter-petition seeking a change of custody. Although there was apparently no provision in the divorce decree prohibiting removal, the trial court nevertheless ruled that the custodial parent had failed to prove that the move was in the child's best interest. The Court of Appeals, citing Walker, reversed that judgment, holding that the non-custodial parent had not adduced any evidence that the move would be adverse to the child's best interests.

We reversed the judgment of the Court of Appeals. In so doing, we quoted the following treatise passage with approval:

6

A court which grants a divorce or separation may expressly authorize the removal of a minor child from the jurisdiction. Similarly, the court has the power to award custody ... to one who contemplates an immediate removal of the child from the jurisdiction .... It has accordingly been stated that it is against the policy of the law to permit the removal of a minor child from the state unless the applicant shows that the best interests of the child will be better served by its removal.

The question whether the court shall permit or prohibit the removal of the child rests within its sound judicial discretion. The general rule that in matters affecting the custody of a child the court will be governed primarily by the welfare and best interests of the child applies in determining whether to permit or prohibit removal of the child from the jurisdiction.

Seessel, 748 S.W.2d at 424, quoting 24 Am. Jur. 2d, Divorce and Separation, § 798 (1966). We also stated that generally the party filing a petition with the court bears the burden of proof on that petition; and we concluded that because the custodial parent had filed a petition seeking permission for removal, the burden rested upon her to prove that removal was in the child's best interests.

Because it required the custodial parent to establish that the move would benefit the child,[1] Seessel represented a substantial curtailment of the traditional legal freedom afforded the custodial parent to make decisions as to the child's residence. Nor was the burden of proof issue the only way in which Seessel served

---

[1] We did not hold, however, that the custodial parent always had the burden of proving that the move would be in the best interests of the child if the divorce decree was silent on removal. Rather, we held that the custodial parent would bear the burden of proof only if he or she filed a petition seeking permission to move. See Nichols v. Nichols, 792 S.W.2d 713, 715 (Tenn. 1990) (Court of Appeals erred in concluding that the custodial parent failed to prove that removal was in children's best interests because custodial parent did not file a petition seeking to move). Thus, we left open the question of whether the custodial parent was required to seek a court's permission for removal at all if the decree was silent on the issue.

7

to limit this freedom.  By explicitly endorsing the use of the best interests of the child standard in removal cases -- a first for this Court -- and declining to set forth any specific principles for determining the best interests, we conferred enormous discretion upon trial courts in deciding the removal issue.  Indeed, we recognized the open-endedness of the best interests test in <u>Rogero v. Pitt</u>, 759 S.W.2d 109, 112 (Tenn. 1988), where we stated:

> There are few legal formulae or invariable principles to guide the courts in decisions of this nature.  Such decisions are primarily factual, not legal.  Attempts to reduce to legal doctrine the resolution of cases such as this usually have little significance.  The best interests of the children under all the circumstances, which, of course, include their relationships with their parents, must be the concern of the courts.

## B. <u>Taylor v. Taylor</u>

It was not long before the approach taken in <u>Seessel</u>, <u>Rogero</u>, and <u>Nichols v. Nichols</u>, 792 S.W.2d 713 (Tenn. 1990), began to cause problems.  In 1993 we noted that "although there was little or no litigation in this area of domestic relations prior to our opinion in <u>Seessel</u>, the trial and intermediate courts have experienced a significant increase in the number of removal cases filed since <u>Seessel</u> was announced."  <u>Taylor</u>, 849 S.W.2d at 326.  Therefore, when presented with the opportunity in <u>Taylor</u> to establish some concrete standards to guide the courts in determining the best interest of the child, we attempted to provide such guidance.

In that case, Deborah and Steve Taylor became divorced in May 1989; the divorce decree provided that the mother was to have custody of their daughter Brittney, and the father was granted visitation rights.

8

There was nothing in the divorce decree that prohibited the mother from removing the child from the state. Nevertheless, several months later the mother filed a petition requesting the court to "modify visitation" so that she and Brittney could move from Memphis to Montana. The mother planned to live with her parents and attend school in that state. The trial court denied this request.

Several months later Ms. Taylor remarried and made plans to move to Davenport, Iowa, where her new husband was enrolled in school. The new husband, Mark Mitten, had established a good relationship with Brittney during previous visits to Memphis, and Ms. Taylor had secured suitable employment in Iowa. Furthermore, the couple had rented an apartment in Davenport, and had made day-care arrangements for Brittney. Although the parties attempted to work out a revised visitation schedule among themselves, the father ultimately refused to allow Brittney to be taken to Iowa.

Subsequently the mother filed a petition requesting that the trial court modify its previous order and allow her to move to Davenport with Brittney. Although the mother denied any intent to defeat the father's visitation rights, and expressed a willingness to allow greater summer and vacation visitation to compensate for the lessened regular visitation that the move would entail, the trial court denied permission to move. The trial court found that the move was not in the best interests of Brittney because she had considerable extended family in the Memphis area, with which she had frequent contact. The Court of Appeals affirmed this judgment, and we granted the mother's application for permission to appeal.

We began our analysis by criticizing the open-endedness of the best interests standard generally, stating that "the absence of standards for its determination threatens to render the concept of 'best interest' so vague that it defies analysis, invites decision by guesswork, and evades any sort of meaningful review on appeal." Taylor, 849 S.W.2d at 326. We then narrowed our focus, noting that the best interests determination in the removal context is not equivalent to the original custody decision and that, therefore, relocation would not, standing alone, constitute a basis for a change of custody. We stated:

> These cases, and others like them, reflect the collective wisdom of both the courts and child psychologists that children, especially those subjected to the trauma of divorce, need stability and continuity in relationships most of all. This recognition had led to a strong presumption in favor of continuity of placement, which is reflected in the well-established rule that courts will not entertain petitions for change of custody unless there has been some change in circumstances that has rendered the custodial parent unfit or has exposed the child to some form of risk.

Id. at 328.

We next turned to the best interests determination itself. After surveying the law of other jurisdictions, we determined that the custodial parent's happiness and well-being are crucial to the child's interests because the custodial parent has the responsibility of caring for the child on a daily basis. Therefore, we stated, "the child's best interests are fundamentally interrelated with those of the custodial parent," id., and the removal decision should be made with this in mind.

We concluded our discussion of the best interests determination by making two observations: (1) that while non-custodial parents have the right to maintain their

10

relationships with their children, visitation is nevertheless a flexible arrangement that may be altered; and (2) that because the non-custodial parent's freedom of movement is not limited by custody considerations, fairness demands that the custodial parent have a commensurate amount of freedom, even though this may require revision of the visitation schedule. We summarized our discussion by enunciating the following list of factors to be considered in the removal decision:

> The factors to be considered in a removal dispute ... include (but are not limited to) a recognition that in removal cases, the question of custody is not subject to de novo review, unless the petition cites reasons other than removal as grounds for custody; that there is a strong presumption in favor of continuity of the original custody award; that the welfare of the child is affected by the welfare of the custodial parent, and that the best interest of the child must be reviewed in order to determine the advantages of the move to the child; that removal of the child from the jurisdiction may require rescheduling of the non-custodial parent's visitation, but that removal is not, in and of itself, a change of circumstance sufficient to justify modification of the custody order; that the courts must be sensitive to the non-custodial parent's efforts to maintain his or her relationship with the children, and that visitation should be arranged in a manner most likely to enhance that relationship; and finally, that the motives of the custodial parent in making the move must appear to be valid, that is, not intended to defeat or deter visitation by the non-custodial parent. These factors, and any related circumstances found by the court to be significant in a given situation, must be weighed individually and collectively.

Id. at 332.

We also addressed the procedural aspects of the removal petition, and concluded as follows:

> If there is no outstanding order restricting movement of the child or children, and the parties can agree to a revised visitation schedule, the custodial parent is free to move without seeking further court authorization. Likewise, if the non-custodial parent consents to the removal and the parties can agree on a revised visitation arrangement,

11

a prior order of restriction may be modified by agreement on motion to the court having jurisdiction of that order and subject to the approval of that court.

If agreement cannot be reached, under the procedural rule announced in Seessel and Nichols, the burden of proof falls on the party seeking relief. In order to discharge that burden, the non-custodial parent who seeks to prevent removal must show by a preponderance of the evidence that removal is adverse to the best interest of the child or children involved. If, on the other hand, the custodial parent files for relief, seeking to lift a prior prohibition on removal or asking the court's permission to move from the jurisdiction, or both, the custodial parent has the burden of proving that removal is in the child's best interest. That burden can be shifted by a prima facie showing of a sincere, good-faith reason for the move and a prima facie showing that the move is consistent with the child's best interest.

Id.

Finally, we applied these rules to that case and reversed the judgment. We explained that:

[The custodial parent] has shown that removal is warranted in this case, based on a well-established reason for the move -- her remarriage to someone who was living, for an equally good reason, some distance from Memphis. There is no suggestion in the record that Deborah Mitten is anything other than a wholly fit person to have custody of Brittney -- indeed, the trial court has now made that finding on three separate occasions. There is no showing that the move will have adverse consequences to Brittney's health or well-being. In fact, the record reflects that the Mittens have gone out of their way to make the move from Memphis to Davenport a smooth one for Brittney, attempting in every way to reduce the impact of the transition on her and looking at all times to her welfare.

It is obvious that the previously established schedule of visitation will have to be altered. There is no proof that this cannot be successfully accomplished to accommodate the interests of both parents, as well as the child's interest. There is nothing in the record to indicate that Deborah Mitten's conduct has been vindictive or that in proposing to move to Davenport, she intended to deprive Steve Taylor of his visitation rights or to interfere with his close relationship with his child.

Taylor, 849 S.W.2d at 333-34.

12

**APPLICATION OF THE LAW OF REMOVAL**

The parties here construe Taylor in very different ways. The mother insists that the case is a complete recasting of Tennessee's law of removal because the Taylor court accepted the proposition that the interests of the child and the custodial parent are fundamentally bound up with one another -- a proposition which, she says, is inherently at odds with the traditional best interests test. The mother urges that under Taylor the court should not judge the wisdom of the custodial parent's decision to relocate. Rather, she states, the proper inquiry is limited to determining whether the custodial parent's motives for moving are "valid, that is, not intended to deter or defeat visitation by the non-custodial parent." Taylor, 849 S.W.2d at 332. Because the lower courts correctly found that she was not attempting to defeat or deter the father's visitation rights by wishing to move, the mother argues, she should be allowed to relocate with Brandon.

The father argues, on the other hand, that Taylor did not change the traditional best interests test, but simply sought to make it clear that the well-being of the custodial parent is to be considered by the courts in reviewing these disputes. He cites as support for this assertion the fact that we stated that "the best interest of the child must be reviewed in order to determine the advantages of the move to the child." Id. at 332. He also relies upon our statement that "much of what we held in the Seessel-Rogero-Nichols trilogy remains good law in Tennessee." Id. at 331. Because Taylor merely revised the best interests standard, he concludes, the lower courts were correct in considering all the circumstances and determining that

13

Brandon's best interests would not be served by moving.

The ultimate message to be gleaned from <u>Taylor</u> is admittedly obscure. This is evidenced by the fact that both of these arguments find support in the text of the opinion, and by the trial court's obvious confusion as to its meaning. Because we have failed to "make determinate an area of law that has become increasingly unsettled," <u>id</u>. at 326, we must dispel the ambiguity of <u>Taylor</u> and clarify its impact on the law of removal.

Although it drew upon authority from many other jurisdictions and dealt with a number of specific sub-issues, <u>Taylor</u> was fundamentally concerned with furthering two overarching goals in the law of removal: (1) "<u>limiting judicial intervention in post-divorce family decision-making, and (2) making disputes easier of resolution if they must be litigated</u>." <u>Id</u>. at 331 (emphasis added). We continue to believe that these goals must determine the law. Moreover, we believe that the traditional best interests of the child test, for the reasons enunciated in <u>Taylor</u>, makes these goals difficult or impossible to achieve. And we are convinced, again for the reasons stated in <u>Taylor</u>, that the interests of the custodial parent and the interests of the child are basically interrelated, even if they are not always precisely the same. Therefore, we conclude, as the mother insists, that a custodial parent will be allowed to remove the child from the jurisdiction unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive -- that is, intended to defeat or deter the visitation rights of the non-custodial parent.

This conclusion does not mean, however, that a non-custodial parent's hands

14

are tied where removal could pose a specific, serious threat of harm to the child. In these situations,[2] the non-custodial parent may file a petition for change of custody based on a material change of circumstances. The petition would state, in effect, that the proposed move evidences such bad judgment and is so potentially harmful to the child that custody should be changed to the petitioner. Because Tennessee law allows custody to be changed if the behavior of the custodial parent clearly posits a danger to the physical, mental or emotional well-being of the child, Musselman v. Acuff, 826 S.W.2d 920 (Tenn. App. 1991), such a petition would not violate Taylor -- which only prohibits a change of custody based solely on the fact of the move. However, expert psychological and/or psychiatric testimony that removal could be generally detrimental to the child will usually not suffice to establish an injury that is specific and serious enough to justify a change of custody. A move in any child's life, whether he or she is raised in the context of a one or two parent home, carries with it the potential of disruption; such common phenomena -- both the fact of moving and the accompanying distress -- cannot constitute a basis for the drastic measure of a change of custody.

With regard to procedure, we conclude that if the parties cannot agree on an acceptable visitation schedule, the custodial parent seeking to remove must file a petition with the court to reapprove or revise, as the case may require, the existing

---

[2] Situations that could pose a "specific, serious threat of harm" to the child are, for example, if the parent wished to take a child with a serious medical problem to an area where no adequate treatment was readily available; if the parent wished to take a child with special educational requirements to an area with no acceptable educational facilities; or if the parent wished to move and take up residence with a person with a confirmed history of child abuse. This list is merely intended as illustrative; it does not purport to be an exhaustive list of situations that would qualify.

visitation schedule.[3]  In the hearing on the petition, the non-custodial parent may, if he or she wishes, present evidence that the custodial parent's motives for moving are vindictive; also, any petition for a change of custody based on the above-discussed grounds shall be heard at this time.  If the non-custodial parent does not wish to raise either of these issues, the sole issue at the hearing shall be the revision of the visitation schedule.  As is the case in the initial proceedings, neither party shall bear the burden of proof on the visitation issue; rather, the trial court shall, in its sound discretion, fashion an acceptable revised visitation arrangement.[4]  Any prior law inconsistent with these conclusions is expressly overruled.

In this case, the trial court expressly found that the mother's motive for moving was not vindictive.  We find that the record supports this conclusion.  Furthermore, although the father presented psychological and psychiatric evidence that Brandon could be harmed by the move, we find that this evidence does not illustrate a harm that is specific and serious enough to justify a change of custody.

---

[3]

If the court finds that the proposed move is of such a limited physical distance that a revision is unnecessary, it may simply reapprove the existing schedule. Otherwise, the trial court will need to fashion a revised schedule. Of course, if the parties can agree to a visitation schedule, then there is no need for the custodial parent to file a petition at all.

[4]

The visitation issue in the initial proceedings is controlled by Tenn. Code Ann. § 36-6-301, which provides, in part, as follows:

> After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health ...

For the foregoing reasons, the judgment of the Court of Appeals is reversed.

_____
FRANK F. DROWOTA III
JUSTICE

Concur:

Anderson, C. J.
Reid, Birch, JJ.

White, J. - Dissenting - see separate dissenting opinion.